UNITED PARK CITY MINES COMPANY, a Delaware corporation, Plaintiff and Appellant,

v.

GREATER PARK CITY COMPANY, a Utah corporation; Deer Valley Resort Company, a Utah limited partnership; Royal Street of Utah, a Utah corporation; Royal Street Development Company, a California corporation; Atlantic Richfield Company, a Delaware corporation, formerly The Anaconda Company, a Montana corporation; ASARCO, Incorporated, a New Jersey corporation; Morgan Guaranty Trust Company of New York, a New York corporation; Fidelity Bank of Philadelphia, a Pennsylvania corporation; Greater Properties, Inc., a Delaware corporation; Park Properties, Inc., a Delaware corporation; Alpine Meadows of Tahoe, Inc., a California corporation; and Royal Street Land Company, a Utah corporation, Defendants and Appellees.

Wells Fargo Bank, N.A., Intervenor.

No. 900306.

Supreme Court of Utah.

Aug. 23, 1993.

Rehearing Denied Nov. 9, 1993.

David K. Watkiss, Perrin R. Love, David B. Watkiss, Carolyn Cox, Salt Lake City, for United Park City Mines Co.

Gordon Strachan, Park City, James A. Boevers, Salt Lake City, for Greater Park City Co. and Alpine Meadows of Tahoe, Inc.

Gary F. Bendinger, Richard W. Giauque, Wendy A. Faber, Salt Lake City, for Deer Valley Resort Co., Royal Street of Utah, Royal Street Land Co., and Royal Street Development Co.

Richard D. Burbidge, Stephen B. Mitchell, Salt Lake City, and Howard L. Edwards, Los Angeles, CA, for Atlantic Richfield Co. and Anaconda Co.

Merlin O. Baker, Jonathan A. Dibble, Keith A. Kelly, Salt Lake City, for ASARCO, Inc.

Randy L. Dryer, Elisabeth R. Blattner, Salt Lake City, and Philip C. Potter, Donald N. Dirks, New York City, for Morgan Guar. Trust, Fidelity Bank of Philadelphia, Greater Properties, Inc., Park Properties, Inc.

Michael F. Jones, Salt Lake City, for Wells Fargo Bank.

HOWE, Associate Chief Justice:

Plaintiff United Park City Mines (UPCM), a Delaware corporation, appeals from a summary judgment dismissing all of its claims against all defendants except Greater Park City Company (GPCC). The trial court directed the entry of a final judgment as to the dismissed claims, making them appealable under rule 54(b), Utah Rules of Civil Procedure.

## THE PARTIES

UPCM, a public company with more than five thousand shareholders, is a successor of several mining companies that operated mines in and around Park City, Utah. It has not actively mined its properties since 1982 but asserts that it could in the future. Defendant The Anaconda Company is a mining corporation which merged with Atlantic Richfield Company (ARCO) in 1977. Defendant ASARCO is also a mining corporation. From 1953 to 1985, Anaconda and ASARCO were controlling shareholders of UPCM, and each elected two directors (usually their employees) to the seven-member board of directors.[1] GPCC is a corporation which has operated the Park City Ski Resort and developed land since 1971. From 1971 to 1975, GPCC was a closely held corporation owned by UPCM and by defendants Royal Street Development Company (RSDC), Morgan Guaranty Trust Co. (Morgan), Fidelity Bank of Philadelphia (Fidelity), and Unionamerica. As will be later explained, GPCC became a wholly owned subsidiary of defendant Alpine Meadows of Tahoe, Inc. (AMOT), in 1975. Nicholas Badami is the president of AMOT and became the chairman of GPCC. The following defendants, collectively referred to as Royal Street, are related entities owned or controlled by Edgar Stern: Deer Valley Resort Company (Deer Valley) is a limited partnership which operates the Deer Valley Ski

---

1. During part of the early 1980s, the board consisted of six members.

Resort; Royal Street of Utah (RSU), a corporation, is the general partner of Deer Valley; Royal Street Land Company (Land) is a corporation engaged in the ski resort and land development business which owns virtually all of the stock of RSU, has effective control over RSU, and through RSU has control over Deer Valley. RSDC is a corporation which is the affiliate and alter ego of Deer Valley, RSU, and Land. RSDC was a shareholder of GPCC from 1971 to 1975 and operated GPCC during that period under a management agreement.

Defendants Morgan and Fidelity are corporations engaged in banking. Defendants Greater Properties, Inc. (GPI), and Park Properties, Inc. (PPI), are corporations wholly owned by Morgan and Fidelity on behalf of certain commingled pension trusts of which Morgan and Fidelity are trustees. GPI and PPI were incorporated by Morgan–Fidelity in 1975 to receive a percentage of ski-lease income generated by GPCC at the Park City Ski Resort and to own the ski-resort base facility. Intervenor Wells Fargo Bank has loaned money to Royal Street, and its loans are secured by mortgages on certain real and personal property.

## FACTS

Over the years, UPCM acquired mining properties with vast acreage and water rights in and around Park City, including the Deer Valley area. It began developing the surface of the land in the early 1960s. Park City Ski Resort, then known as Treasure Mountain Resort, opened in late 1963 with base and summit facilities, chair lifts, and a gondola. Also, a nine-hole golf course was developed adjacent to the base facilities. The operations continued to grow each year, but additional development was required to establish Park City as a destination resort.

In 1970, Edgar Stern of Royal Street made a proposal to Anaconda and ASARCO to expand the development of UPCM's resort properties. Stern proposed a partnership in which UPCM would contribute the land and water, including its existing Park City ski operations and resort properties. Royal Street would manage and develop the resort and find a third partner to contribute capital.

For tax reasons, the parties formed a closely held corporation instead of a partnership. Thus, GPCC was formed.

In 1971, a series of land and water agreements and land leases were executed (collectively referred to as the 1971 agreements). In those agreements, UPCM sold Park City Ski Resort to GPCC, along with all of the base facilities and other personal property, 4200 acres of development property, and water rights. The selling price was $6,126,000 payable over time. UPCM also leased nearly 6000 acres for ski runs to GPCC for twenty years with a twenty-year extension for a rental based on a percentage of ski-lift revenues. In return, UPCM received the right to participate in the growth of the ski resort as GPCC's major shareholder and senior creditor.

Throughout much of 1972, 1973, and 1974, GPCC experienced financial problems. UPCM charges that Royal Street committed management errors, including overexpansion, negligent construction practices, construction cost overruns, and unsound debt/equity ratios, which, when combined with rising interest rates, generated substantial book losses for GPCC. By the summer of 1974, GPCC was highly leveraged and unable to service its growing debt, then in excess of 20 million dollars.

In early 1975, GPCC failed to make substantial payments due UPCM under the 1971 agreements. UPCM was entitled under the cross-default provisions to terminate all of the agreements and take possession of the resort facilities and all other unconveyed properties covered by the agreements. Instead, UPCM restructured the agreements through a series of amendments entered into in 1975. UPCM continued to sell its properties and water rights for the 1971 prices but with extended payments. UPCM gave up its major equity interest in GPCC and extended the ski leases for two additional twenty-year terms. At a special stockholders' meeting held October 7, 1975, the restructuring was approved. A proxy statement explaining the proposal had been mailed to each stockholder prior to the meeting. As will be hereafter more fully discussed, six stockholders wrote

the board expressing concern over the adequacy of the information in the proxy statement and questioning the fairness of the proposal to UPCM.

In August 1985, Anaconda and ASARCO sold their stock in UPCM. New management took control and one year later instigated this lawsuit. In 1988, an amended complaint named Anaconda and ASARCO as defendants. UPCM contends that prior to 1985, Anaconda and ASARCO controlled the board of directors by electing a majority of the board. It asserts that all of the directors were their employees, former employees, attorneys, bankers, and other persons who, due to contractual and historical relationships with Anaconda and ASARCO, did not act independently for the best interests of UPCM. UPCM alleges that once new management arrived, apparent violations of the 1975 restructured agreements by GPCC and Royal Street led to an investigation of the circumstances surrounding their making.

The amended complaint charges that Anaconda and ASARCO, as controlling shareholders of UPCM in 1975, breached their fiduciary duties to UPCM by causing it to give up, for grossly inadequate consideration, its valuable interests in the ski operations and development properties to protect and concentrate on their interests in Park City Ventures. The latter was a joint venture formed in 1970 by Anaconda and ASARCO to mine UPCM's properties. Anaconda and ASARCO caused UPCM to lease to Park City Ventures all of its mining property and equipment, with Anaconda and ASARCO receiving two-thirds of the net mining profits. It is not suggested that either Anaconda or ASARCO secretly profited in any way by the 1975 restructuring.

UPCM further alleges that Royal Street and Morgan–Fidelity owed fiduciary duties to UPCM as co-shareholders with UPCM in GPCC and breached those duties by obtaining unfair advantage over UPCM in the 1975 restructuring. Finally, it is alleged that GPCC and AMOT, to their financial advantage, aided and abetted the fiduciary duty breaches by Anaconda, ASARCO, Royal Street, and Morgan–Fidelity.

The amended complaint contains twelve claims for relief. The first and second claims seek damages from Anaconda and ASARCO for breaches of their fiduciary duties of loyalty, fairness, and care in causing UPCM to enter into the unfair 1975 agreements. The third claim asserts that GPCC, AMOT, Royal Street, and Morgan–Fidelity aided and abetted Anaconda's and ASARCO's breaches of duty and seeks damages and equitable remedies. The fourth claim asserts that Royal Street and Morgan–Fidelity breached fiduciary duties they owed UPCM as co-shareholders in GPCC and that AMOT aided and abetted those breaches. The fifth and sixth claims allege contractual and lease breaches by GPCC and Royal Street. The seventh claim alleges trespass by GPCC on UPCM's land. The eighth and ninth claims against GPCC and Royal Street seek to remedy underpayment of ski-lift revenues owing to UPCM. The tenth claim alleges that GPCC violated its duty of good faith in its contractual relations with UPCM. The eleventh claim seeks a declaration of Morgan–Fidelity's rights under the 1975 agreements. Finally, the twelfth claim seeks reformation of the water agreements with GPCC and Royal Street to allow UPCM to use its reserved 2850 gallons per minute for all purposes rather than just for "mining, milling, and related purposes."

The trial court in granting summary judgment held that (1) UPCM's claims challenging the 1975 agreements were barred by the three-year statute of limitations in Utah Code Ann. § 78–12–27 or the four-year statute of limitations in section 78–12–25(3) because UPCM knew or should have known of its claims in 1975; (2) the claims against Anaconda and ASARCO were also barred by the doctrine of *Bangor Punta Operations, Inc. v. Bangor & Aroostock R.R.*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974);[2] (3) no genuine issues of fact existed as to UPCM's claims against Anaconda and ASARCO; (4) UPCM had failed to state claims against GPCC or AMOT for aiding and abet-

---

2. Because we hold that the trial court was correct in dismissing those claims based on the applicable statutes of limitation, we have no reason to discuss the *Bangor Punta* doctrine.

ting breaches of fiduciary duty; (5) UPCM's claim for reformation of the agreements was time-barred and should be denied because of UPCM's acceptance of payments under the agreements or because of estoppel; (6) any breach of the water agreement by GPCC had been cured by full payment of the purchase price for the water, and UPCM's other claims for breach were not breaches or had been cured or waived; and (7) GPCC had not committed trespass through the construction of a ski-lift tower and maintenance building on UPCM property. During the pendency of this appeal, UPCM settled with Royal Street and intervenor Wells Fargo, and it dismissed all claims against them with prejudice.

## STANDARD OF REVIEW

When reviewing a summary judgment, this court recites the facts in the light most favorable to the nonmoving party. There must be no material issue of fact. One of the grounds for summary judgment was that relevant statutes of limitations had expired, thus barring many of UPCM's claims. This being a conclusion of law, we review it for correctness.

## CLAIMS AGAINST ANACONDA AND ASARCO

■ The trial court found that the evidence was undisputed that (1) in 1975, three independent directors were on the UPCM board when the restructuring plans and resort agreements were considered and approved, (2) the three independent directors had full knowledge concerning the terms of the restructuring and its effects upon UPCM and then voted in favor of the restructuring, and (3) the independent directors were not implicated in any wrongdoing, did not have any conflicts of interest, and were fully informed of all material facts involving the restructuring plan and the subsequent execution of the 1975 agreements. Additionally, the trial court found:

In 1975, the shareholders of UPCM had actual knowledge of the restructuring plan and the leases and agreements relating thereto, or they were put on notice of facts which would lead a person of ordinary prudence to discover the alleged wrong-

doing, sufficient to commence the running of the statute of limitations.

Based on those findings of fact, the trial court held that UPCM's action against Anaconda and ASARCO was barred by Utah Code Ann. § 78–12–27, which provides:

Actions against directors or stockholders of a corporation to recover a penalty or forfeiture imposed, or to enforce a liability created, by law must be brought within three years after the discovery, by the aggrieved party, of the fact upon which the penalty or forfeiture attached, or the liability accrued, and in case of actions against stockholders of a bank pursuant to levy of assessment to collect their statutory liability, such actions must be brought within three years after the levy of the assessment.

UPCM assails those findings of fact and contends that it proffered evidence that none of the members of the board of directors were independent of Anaconda and ASARCO until August 1985, when new management took control, and that the statute of limitations did not begin to run until that date.

■ A corporation discovers wrongdoing by its officers, directors, or controlling shareholders through outside shareholders or independent directors. "Discovery" of breach of fiduciary duty thus has two components: The shareholders or directors must have knowledge of the wrongdoing or facts that put them on inquiry and must be sufficiently independent to be able to assert a claim on behalf of the corporation. As long as the wrongdoers remain in control of the corporation and conceal their wrongdoing from shareholders or independent directors, the statute of limitations on the corporation's claims against them is tolled. *See, e.g., Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 876–79 (9th Cir.), *cert. denied,* 469 U.S. 932, 105 S.Ct. 329, 83 L.Ed.2d 265 (1984); *IIT & Int'l Inv. Trust v. Cornfeld,* 619 F.2d 909, 928–32 (2d Cir.1980).

Some federal courts have held that in order to toll the statute of limitations, a plaintiff must allege and show full, complete, and exclusive control of the corporation by the wrongdoers so that the possibility that an

informed stockholder or director could have induced the corporation to sue is negated. *See, e.g., Mosesian,* 727 F.2d at 879; *International Rys. of Cent. Am. v. United Fruit Co.,* 373 F.2d 408; 414 (2d Cir.1967).

In *United Fruit,* the plaintiff corporation brought an antitrust and breach of contract action against the defendant, which controlled the election of the corporation's nine directors. The defendant moved for summary judgment based partly on the statute of limitations. The corporation contended that the statute was tolled until the defendant relinquished its control of the corporation. The Second Circuit Court of Appeals determined that the statute was not tolled, the action was barred, and summary judgment was properly granted. The court held that the corporation had failed to carry its burden of negating the possibility of suit against the corporation while the defendant was in control because three independent directors were on the board:

> One principle emerging with some clarity is that a plaintiff who seeks to toll the statute on the basis of domination of a corporation has the burden of showing "a full, complete and exclusive control in the directors or officers charged." Such control was found for example in *Adams v. Clarke,* 22 F.2d 957 (9 Cir.1927), where all the directors were accused of wrongdoing and held a majority of the capital stock.... This principle must mean at least that once the facts giving rise to possible liability are known, the plaintiff must effectively negate the possibility that an informed stockholder or director could have induced the corporation to sue. And here we think [plaintiff] fails.
>
> . . . .
>
> Since [plaintiff] has not met its burden of demonstrating that, after the election of the three independent directors in 1959, [defendant] had such "full, complete and exclusive control" as to rule out the possibility of a corporate suit against it, on the demand of a stockholder or director, for antitrust violations the facts giving rise to

which had become well-known, any tolling of the statute ended at least by that time. 373 F.2d at 414–16 (citation omitted).

The Ninth Circuit Court of Appeals has held that an action is time-barred if the plaintiff discovered or should have discovered the alleged wrongdoing within the limitation period and that the question of when it was or should have been discovered is a question of fact. *Mosesian,* 727 F.2d at 877. The *Mosesian* court further added that the question may be decided as a matter of law only when " 'uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the fraudulent conduct.' " *Id.* (quoting *Kramas v. Security Gas & Oil Inc.,* 672 F.2d 766, 770 (9th Cir.), *cert. denied,* 459 U.S. 1035, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982)).

In *Kramas,* the plaintiff actually knew of the alleged fraud. He consulted with the Securities and Exchange Commission and even suggested to other investors the possibility of an action for fraud.

The Washington Court of Appeals decided a case in which a minority stockholder brought a derivative action on behalf of a corporate automobile dealership, seeking the profit from the majority stockholder, who bought a company-owned car for $6500 and later sold it for $40,000. The court held that the action was barred by the statute of limitations because one officer and director of the corporation had knowledge of facts sufficient to put one on inquiry, which could have led to the discovery of the alleged fraud. *Interlake Porsche & Audi, Inc. v. Bucholz,* 45 Wash.App. 502, 728 P.2d 597 (1986).

The Washington court further held that if one director knew facts which by the exercise of due diligence could have led to the discovery of the alleged wrongdoing, that director's knowledge "is imputed to the corporation." *Id.* 728 P.2d at 607. Finally, the court concluded that "even in an action for fraud where a fiduciary relation exists, the burden is upon the plaintiff to show that the facts constituting the fraud were not discovered until within 3 years prior to the commencement of the action." *Id.* 728 P.2d at 608.

Anaconda and ASARCO assert that during the entire relevant period of time, including

1974 and 1975, when the alleged wrongdoing occurred, there were always three independent directors on UPCM's board who could have instituted legal action on behalf of the corporation:

| | |
|---|---|
| Sid Cornwall<br>Retired partner,<br>VanCott, Bagley,<br>Cornwall & McCarthy | April 1969 to<br>December 1980 |
| Miles P. Romney<br>Former president, Utah<br>Mining Association | July 1970 to<br>December 1980<br>(deceased) |
| Harold J. Steele<br>President, First<br>Security Bank | April 1969<br>to June 1978 |
| Wheeler M. Sears<br>President, Cimarron<br>Corporation | January 1981<br>to August 1985 |
| Hugh J. Leach<br>Vice president,<br>Western Operations of<br>Cleveland Cliffs Iron Co. | December 1981<br>to present |

UPCM counters that these directors may have been technically independent in the sense that they were not employed by Anaconda or ASARCO but charges that they had close business ties with them and that they therefore could not and did not act independently of them. UPCM relies upon *Federal Deposit Insurance Corp. v. Howse*, 736 F.Supp. 1437, 1442 (S.D.Tex.1990), for the proposition that the statute of limitations is tolled as long as controlling shareholders or directors adversely dominate a majority of the board, whether or not a minority of the board is independent. *Farmers & Merchants National Bank v. Bryan*, 902 F.2d 1520 (10th Cir.1990), is cited by UPCM as an example of where a court found a question of fact to exist as to the ability and willingness of the outside directors because of their domination to bring suit on behalf of the corporation. UPCM points out that Cornwall had for many years been a partner in a law firm which represented both Anaconda and UPCM, that Romney was a mining consultant who served as president of UPCM when the restructuring was approved, and that Steele was president of a bank which had long-standing relationships with Anaconda and ASARCO.

We need not and do not decide whether UPCM raised a question of material fact as to the domination of these directors and their ability and willingness to bring suit on behalf of the corporation so as to preclude summary judgment. That is unnecessary because we conclude that as a matter of law (1) the shareholders, as a class, were given sufficient information in the proxy statement that was mailed to them to put them on notice of further inquiry into the fairness of the restructuring agreements and (2) the statute of limitations began to run on the date of the special stockholders' meeting on October 7, 1975.

In *White v. Federal Deposit Insurance Corp.*, 122 F.2d 770 (4th Cir.1941), *cert. denied*, 316 U.S. 672, 62 S.Ct. 1043, 86 L.Ed. 1747 (1942), the FDIC brought suit against certain bank directors to recover bank assets transferred to them and to recover a judgment for bank monies alleged to have been received by them, in large part, as collections made on the transferred asset. The issue arose as to whether the defendants were entitled to the benefit of a statute of limitations with respect to the assets transferred to them and the collections made thereon. In holding that the defense was available to the defendants, the court stated:

It is argued that the statute did not run in favor of the directors because, it is said, they control the corporation through a majority of stock ownership and control of the directorate and there was consequently no one to sue them. It is clear, however, that suit in behalf of the corporation could have been brought by any of the independent stockholders.

We do not hold that knowledge of a single stockholder or of a bank examiner would be imputed to the bank, nor that the right of such stockholder or the banking authorities to seek a remedy would, of itself, set the statute of limitations running. What we do hold is that knowledge of all the stockholders is knowledge of the bank and that where these and the banking authorities have such knowledge and have power under the law to institute suit and take other action to remedy the situation, the statute of limitations is set in motion. In other words, there is no reason why the running of the statute with respect to a diversion of assets should be suspended when all parties affected there-

by have knowledge thereof and full power under the law to pursue a remedy.

*Id.* at 775–76 (citations omitted).

In *Armstrong v. McAlpin*, 699 F.2d 79 (2d Cir.1983), a derivative action was brought by a receiver and a shareholder on behalf of a mutual fund, alleging securities fraud. The statute of limitations was interposed as a defense which was upheld by the trial court on the ground that the shareholders could have discovered the alleged fraudulent conduct before the statute of limitations ran. This ruling was upheld on appeal where it was stated:

> Assuming for the argument only that appellants' complaint adequately alleges exclusive domination and control [of the board of directors], the district court nonetheless did not err in holding that shareholders as a class should have known the skulduggery was taking place....
>
> ....
>
> ... "[W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, the duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." *Higgins v. Crouse*, 147 N.Y. 411, 416, 42 N.E. 6 (1895).

*Armstrong*, 699 F.2d at 88 (citations omitted except *White*, 122 F.2d at 775–76).

Turning to the instant case, the trial court found that the six-page proxy statement mailed to the stockholders prior to the special meeting held October 7, 1975, "stated in detail what UPCM was giving and what it was receiving." We agree. The salient points of the proxy statement are summarized in the following three paragraphs.

As the result of GPCC's failure to meet its existing contractual obligations, the principal creditors and stockholders of GPCC entered into a tentative agreement to adjust the assets and liabilities of GPCC. UPCM agreed to the restructuring subject to approval by a majority of its stockholders. Anaconda and ASARCO approved of the restructuring. The ultimate purposes of the intended transaction were to relieve GPCC of real estate inventory, real estate held for development, and essentially all of its real estate mortgage debt and to infuse into GPCC adequate equity capital to place it on a solid financial footing whereby its operations would become successfully and profitably conducted. The opinion of management was that if GPCC was not restructured, it would not be able to meet its obligations to UPCM or its other creditors and would cease to operate.

One of UPCM's remedies for GPCC's default was to take back all of the property sold to GPCC that had not yet been conveyed (2014 acres), to retain all payments which GPCC had made, and then to take whatever action was appropriate for the operation of the ski properties and development and sale of real property. Another option was to treat the purchase agreement as a mortgage and proceed to foreclose it. However, management believed that such actions might result in protracted and complex legal proceedings and would be detrimental to UPCM's interests. Therefore, the board of directors concluded that the proposed restructuring would be in UPCM's best interests.

UPCM owned 63.2 percent of the preferred stock and 39.4 percent of the common stock of GPCC, which it had acquired for $972,000. UPCM would sell the preferred stock to GPCC for $1000 and the common stock to AMOT for $1000. Accrued interest due and owing from GPCC to UPCM in the amount of $248,652 [3] would be cancelled. No payment of principal owing on the contract for the purchase of land would be required until 1978. The ski leases would be amended to provide for two additional extensions of twenty years each with a small percentage increase in the ski-lift revenue. The current fair market value of the property being purchased by GPCC under the 1971 agreements was not known by UPCM. The principal

---

**3.** Including accrued and unpaid interest under the purchase agreement in the amount of $169,030; accrued and unpaid interest under the water rights agreement in the amount of $17,500; and accrued and unpaid interest on a stockholders loan (all stockholders of GPCC infused capital in the amount of $2,000,000, UPCM's share of which was $787,040) in the amount of $62,122.

assets in which the other parties were involved in the restructuring were discussed.

At the special stockholders' meeting held on October 7, 1975, a letter the board received from Jerome Gartner, a New York City attorney, was discussed. Gartner wrote the letter on behalf of Timothy Donath, a long-time UPCM shareholder. He demanded that the scheduled stockholders' meeting be adjourned

> until you issue a revised proxy statement setting forth the fairness of the consideration to be received by the [UPCM] stockholders; and consider, review and modify your proposed final sale of the valuable ski resort.... And further, that you take immediate steps to withdraw your signature and approval from the proposed reorganization of GPCC (Greater Park City Corporation, which presently controls the ski area) and related corporations, until careful review of the proposed abandonment of the invaluable rights of the ski area now possessed by [UPCM].

At the stockholders' meeting, the directors discounted the claims made by Gartner, and Miles P. Romney (then president of UPCM) responded by telegram to Gartner that the directors had considered his objections and concluded that it was in the best interests of UPCM to agree to the proposed restructuring.

Five other stockholders also wrote the board, questioning the adequacy of the consideration that UPCM would receive in the restructured agreements. For example, one stockholder called the proposal a "boondoggle" and said that it was

> interesting to note that an asset with sufficient book value to act as a tax deduction, now has absolutely no value.... Two new corporations born on the assets of a bankrupt. The ramifications are so deep, so insidious and unbelievable that, it could constitute a text for uncontrolled corporate maneuver.

Another stockholder felt so ignorant of the "terms, legal claptrap arguments, evasions, and loopholes involved in the proxy statement" that he signed under protest to preserve his rights to seek legal redress against UPCM if there "is any larceny, legal or illegal rascality or subterfuge involved."

█ It is true, as argued by UPCM, that more information could have been included in the proxy statement which would have further illuminated any unfairness in the proposal. However, disclosure of every detail is not required. All that is required is that the proxy statement contain sufficient information to apprise the stockholders of the corporation's action so as to put them on notice to make further inquiry if they harbor doubts or questions about the proposal. *White*, 122 F.2d at 774–75; *Armstrong*, 699 F.2d at 88–89. The statement here discloses the very facts out of which UPCM's contention of unfairness arises. It details that GPCC was in default and that UPCM could terminate the contracts to sell GPCC land and water and cancel the ski leases. A quarter of a million dollars of interest was being forgiven. For two thousand dollars, UPCM was giving up its preferred and common stock in GPCC for which it had paid nearly a million dollars. The ski leases were being extended for only a slight increase in the ski-rental revenue. Generous concessions on the part of UPCM were evident throughout the proxy statement. The fact that the board did not know the current value of the properties involved in the agreement raised a question as to the wisdom of the restructuring as opposed to repossessing the properties. We acknowledge that only the eighteen shareholders who personally attended the stockholders' meeting had actual notice of the six letters protesting or questioning the proposed restructuring that were sent to the board. We mention the letters only to demonstrate that these six shareholders had no difficulty in discerning from the proxy statement that UPCM was not receiving adequate consideration. There is no reason to suspect that other shareholders who studied the proxy statement could not have been similarly alerted to the questionableness of the proposal. The fairness of the proposal to UPCM was clearly raised as the details of the proxy statement were read and considered.

UPCM relies upon *deHaas v. Empire Petroleum Co.*, 286 F.Supp. 809 (D.Colo.1968),

*aff'd*, 435 F.2d 1223 (10th Cir.1970), as controlling. In *deHaas*, shareholders brought a derivative suit in connection with a merger of a parent and its subsidiary corporation. The defendants argued that the statute of limitations had expired because the named plaintiffs had "doubts about the advisability of the merger, ... were acquainted with key officers of [the parent corporation], and yet failed to make inquiries or protests against the action." *Id.* at 813. The plaintiffs, however, argued that their consent was obtained through misleading proxy solicitations and subsequent encouraging letters from management. *Id.* at 812. They also argued that "while they doubted that the merger was good business practice, they relied upon [the controlling shareholders'] integrity and the information provided them by management" and that they had no reason to suspect fraud until much later. *Id.* at 813. The *deHaas* court denied the defendants' motion for summary judgment, finding that there was a fact question as to the amount of knowledge available to the plaintiffs and the reasonableness of their conduct. *Id.* We do not question the rationale of *deHaas;* however, it is not controlling here. No suggestion of fraud or secret profiting by the board, Anaconda, or ASARCO is alleged in the present case. Moreover, the proxy statement in the instant case was, as has been pointed out, sufficient to raise questions of fairness of the proposal presented, whereas in *deHaas* the court found that the proxy material was "clearly inadequate to have aroused a reasonable suspicion." *deHaas*, 435 F.2d at 1226; *see Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1491 (D.C.Cir.1989) (statute tolled where there was fraudulent concealment).

Therefore, we hold that the statute of limitations began to run on October 7, 1975, barring UPCM's claims against Anaconda and ASARCO long before this action was filed.

## CLAIMS AGAINST AMOT AND MORGAN–FIDELITY

UPCM alleged that AMOT and Morgan–Fidelity (and GPI and PPI) induced, aided, and abetted Anaconda and ASARCO in breaching their fiduciary duty. UPCM further alleged that Morgan–Fidelity breached fiduciary duties they owed to UPCM as co-venturers, de facto partners, and co-shareholders in GPCC. It sought reformation of certain provisions of the 1975 agreements which it considered unconscionable. The trial court dismissed the claims for aiding and abetting and for breach of duty because they were barred by the four-year statute of limitations for actions not otherwise provided for by law, Utah Code Ann. § 78–12–25(3). As a general rule, the statute begins to run upon the happening of the last event necessary to complete the cause of action. *Becton Dickinson & Co. v. Reese*, 668 P.2d 1254, 1257 (Utah 1983). All acts by AMOT and Morgan–Fidelity which are complained of occurred no later than the date of UPCM shareholders' meeting, October 7, 1975, and we have held that UPCM's shareholders indisputably had sufficient knowledge to put them on inquiry. We therefore affirm the dismissal of those claims against AMOT and Morgan–Fidelity. We also affirm the dismissal of the claim for reformation of the 1975 agreements because it is barred by section 78–12–23(2), requiring actions based on a written contract to be brought within six years. *Cf. Reese Howell Co. v. Brown*, 48 Utah 142, 158 P. 684 (1916); *Weight v. Bailey*, 45 Utah 584, 147 P. 899 (1915).

## CLAIMS AGAINST GPCC

UPCM sought reformation of the 1975 agreements as against GPCC to remedy their unconscionable unfairness resulting from GPCC's breaches of fiduciary duty to UPCM and aiding and abetting Anaconda and ASARCO in their breaches. In particular, the two additional twenty-year extensions of the ski leases were assailed as unfair. UPCM also sought to reform the 1971 water agreement to permit it to use its reservation of 2850 gallons per minute of group II water for any and all purposes rather than only for "mining, milling and related purposes" as the agreement provides. UPCM argues that these provisions were unconscionable when the contracts were made in 1971 and in 1975 and that their unconscionability has been exacerbated by subsequent events. Therefore, it is clear that the applicable six-

year statute of limitations on actions on written contracts began to run no later than 1975 and had long expired before this action was filed in 1986.

UPCM further alleged that GPCC breached the 1971 water agreement by filing with the Utah state engineer a bad-faith protest against UPCM's application to the engineer for an extension of time to resume the use of certain of its water rights. In the water agreement, UPCM reserved 2850 gallons flowing from eleven of its mining claims. It is now not using any water from five of the claims but asserts that it may use that water in the future if it resumes mining operations. Paragraph 14 of the water agreement prohibits GPCC from taking any action without UPCM's approval "which may impair water rights." The trial court granted summary judgment in favor of GPCC on this issue on the ground that after the commencement of this action, GPCC made the final payment of the purchase price for the water, rendering moot any cause of action UPCM might have had for breach of contract. This was error. Clearly, the obligation imposed on GPCC by paragraph 14 survives payment of the purchase price. That paragraph imposes a continuing duty on GPCC to protect the water right, the use of which under the agreement is shared by both UPCM and GPCC. Because of this shared use, the agreement requires cooperation and the exercise of good faith between the users to use the water beneficially to protect the water right from being lost due to forfeiture for nonuse.

UPCM has also alleged that the water agreement has been breached by the failure of GPCC to pay the cost of treating the water coming from the Ontario No. 2 drain tunnel. While the facts in the record regarding this matter are sketchy, it appears that the water is polluted as it emerges from the drain tunnel and that since 1982, UPCM has treated the water at an annual cost of approximately $350,000. UPCM contends that this cost should have been borne by GPCC under paragraph 5 of the water agreement, which requires GPCC to pay the cost of treatment "as necessary for the purposes of GPCC." The trial court granted GPCC summary judgment on this cause of action on the ground that GPCC's final payment of the purchase price rendered moot any cause of action. This was error. Since the water agreement contemplates and provides for joint use of the water, final payment of the purchase price does not affect the continuing nature of the obligation imposed in paragraph 5. Factual questions remain as to how much, if any, of the water GPCC uses and is thereby liable for treating. We also find unavailing the trial court's reasoning that UPCM had waived or was estopped from asserting this cause of action for breach of contract because during the years in question UPCM treated the water at its own cost and, in its annual report to its shareholders, reported that GPCC was current in its obligations. Waiver requires the intentional relinquishment of a known right. *See Soter's, Inc. v. Deseret Fed. Sav. & Loan,* 857 P.2d 935, 938 (Utah 1993) (citing *Phoenix Inc. v. Heath,* 90 Utah 187, 194, 61 P.2d 308, 311–12 (1936)). Estoppel requires "(1) an admission, statement, or act inconsistent with the claim afterwards asserted, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act." *Celebrity Club, Inc. v. Utah Liquor Control Comm'n,* 602 P.2d 689, 694 (Utah 1979). Factual questions remain as to whether the elements of waiver can be made out and whether the elements of estoppel are present, including whether GPCC relied to its detriment on the statements in the annual reports and whether it sustained an injury.

In the final cause of action for breach of contract, UPCM alleged that GPCC failed to include in its calculation of revenue from the sale of ski-lift tickets (a percentage of which revenue UPCM is entitled to) the value of lift tickets GPCC traded for goods and services, sold at a discount, or gave away. In 1985, UPCM audited the lift-revenue accounting records for the first time and discovered this omission. The trial court granted summary judgment in favor of GPCC on the ground that UPCM had waived or was estopped from pursuing any claim for breach of contract because UPCM had certi-

fied to an escrow agent for the parties and reported in its annual report to its shareholders that GPCC was current in its payments under the ski leases. Once again, summary judgment was improperly granted because the record does not reflect undisputed facts which would support the invocation of waiver or estoppel. Remand on this issue therefore is required for the trial court to further consider this cause of action with the other two causes of action for breach of contract discussed above. UPCM does not dispute that all of its claims for breach of contract would be subject to the six-year statute of limitations contained in section 78–12–23(2).

Finally, UPCM contends that GPCC trespassed by constructing a maintenance building and a ski-lift tower (the Town Lift) on UPCM property which was not under lease to GPCC. The trial court held that these trespass claims failed (1) because of UPCM's contractual duties of cooperation with GPCC under paragraph 19 of the land purchase agreement, (2) because of UPCM's written and verbal consent to GPCC's use of the land in question, and (3) because the Town Lift was constructed on property subject to the resort-area lease. We shall consider each of these grounds.

Paragraph 19 provides:

UPCM will, upon request, grant to [GPCC] such easements over its properties as may be reasonably necessary for ingress and egress to and from any of the Subject Properties, provided that the nature and duration of such easements shall be subject to the approval of [UPCM] and the use thereof shall be subject to such reasonable conditions and restrictions as [UPCM] shall impose.

That paragraph deals with the granting of easements for ingress and egress and cannot be construed to require UPCM to allow a building and a ski-lift tower to be built on nonleased property. Doing so would require us to stretch the language far beyond any reasonable limits. The alleged trespasses cannot therefore be justified under paragraph 19.

As to UPCM's giving written and verbal consent to the location of the mainte-

nance building, the record reflects that an issue of fact exists. While GPCC apparently relies on a deposition of E. LaMar Osika, former secretary of UPCM, that consent was given, UPCM relies on the affidavit of Osika's son, Edwin L. Osika, Jr., presently executive vice president and secretary-treasurer, that while the subject was discussed, no agreement was reached. There being a dispute in the facts, summary judgment cannot rest on the ground of consent.

The final ground relied upon by the trial court for summary judgment was that the Town Lift had been constructed by GPCC on land under its lease. UPCM counters that while the site of the lift was originally under the lease, UPCM had the right under paragraph 14 to sell certain parts of the leased premises that GPCC was not using to third parties, provided GPCC was given the first right of refusal. Pursuant to this provision, UPCM gave one John Sweeney an option to purchase seventy-five acres which included the lift site. GPCC declined to exercise its first right of refusal. Before the option expired, the parties entered into a third amendment to the lease on December 12, 1980, which excluded the seventy-five acres from the scope of the lease. Sweeney did not exercise his option, but his failure to do so did not bring the property back under the lease.

In its brief, GPCC asserts that it did not receive any consideration for excluding the seventy-five acres from the lease in the third amendment. However, the amendment recites that "good and valuable consideration" has been given, the "receipt and sufficiency whereof are hereby acknowledged." GPCC has not in its pleadings sought to be relieved of its agreement under the third amendment because of lack of consideration. Consequently, that defense is not before us. The summary judgment cannot be supported on the ground that the Town Lift site is under the lease. The summary judgment on the trespass claims is therefore reversed, and the case is remanded for further proceedings on these claims.

## ADDITIONAL DISCOVERY UNDER RULE 56(f)

Soon after UPCM amended its complaint, adding additional defendants, including Ana-

conda and ASARCO, a motion was made to disqualify UPCM's legal counsel. Discovery was stayed pending resolution of that motion, which was eventually denied. When the stay was lifted, defendants moved for summary judgment. In response, UPCM moved for additional time for discovery pursuant to rule 56(f). It argued that it had been unable to depose certain key witnesses, many of whom were employees or former employees of Anaconda and ASARCO, and to obtain vital documents held by those two former majority stockholders. Further discovery, UPCM asserted, would assist in finding whether defendants had breached their fiduciary duty or aided or abetted others in doing so, whether UPCM could have discovered or asserted its fiduciary duty claims in 1975, and whether GPCC breached the 1971 and 1975 agreements. The trial court denied UPCM's motion.

We have held that when a party timely presents an affidavit under rule 56(f) stating reasons why it is unable to proffer an evidentiary affidavit in opposition to its opponent's motion for summary judgment, the trial court's discretion is invoked. Unless the court finds the affidavit " 'dilatory or lacking in merit, the motion should be liberally treated.' " *Cox v. Winters,* 678 P.2d 311, 312–13 (Utah 1984) (quoting *Strand v. Associated Students of Univ. of Utah,* 561 P.2d 191, 194 (Utah 1977)).

We find no abuse of discretion in the denial of UPCM's motion as respects its claims which we have held in this opinion are barred by statutes of limitations. Prior to making Anaconda and ASARCO defendants, UPCM obtained from them many documents pertaining to the 1971 and 1975 agreements. Moreover, as we have noted above, the evidence is undisputed that UPCM's shareholders either knew or had sufficient knowledge in 1975 to put them on further inquiry concerning any breach of duty defendants owed UPCM. Further discovery against Anaconda and ASARCO would not have altered or diminished that fact.

However, the motion for additional time for discovery with respect to UPCM's breach of contract and trespass claims against GPCC stands on a different footing. We

have determined that summary judgment was improper because there are factual issues which must be resolved in an evidentiary hearing. On remand, the trial court should liberally grant both parties the opportunity for further discovery as may be reasonably necessary to assist in the resolution of those claims.

## CONCLUSION

The summary judgment appealed from is affirmed in part and reversed in part. The case is remanded to the trial court for further proceedings in accordance with this opinion.

HALL, C.J., DURHAM and ZIMMERMAN, JJ., and NORMAN H. JACKSON, Court of Appeals Judge, concur.

STEWART, Justice, having disqualified himself, does not participate herein; NORMAN H. JACKSON, Court of Appeals Judge, sat.